# COURT OF APPEALS OF TEXAS.

## GALVESTON TERM, 1887.

. 23   1'
  31   150

### No. 2104.

### EDWARD HOLST *v.* THE STATE.

1. RAPE—EVIDENCE.—In this State the common law rule in rape cases obtains, that neither the particulars of the injured female's complaint nor the name of the person she mentioned as the offender can be proved as original evidence, though they may be brought out by the defendant, if he chooses, upon cross examination. Under this rule the trial court erred in permitting the State to prove the particulars of the complaint made by the prosecutrix and the name she gave as that of the person who assaulted her.

2. PRACTICE—QUALIFICATIONS OF A WITNESS.—Article 730 of the Code of Criminal Procedure provides as follows: "Children or other persons who, after being examined by the court, appear not to possess sufficient intelligence to relate transactions with respect to which they are interrogated, or who do not understand the obligation of an oath, are incompetent witnesses." See the opinion *in extenso* for circumstances under which it is *held* that the prosecuting witness was incompetent to testify, because, even if intelligent enough to relate the transaction, she was not sufficiently intelligent to understand the obligation of an oath.

APPEAL from the District Court of Jefferson. Tried below before the Hon. W. H. Ford.

The indictment in this case charged the appellant with the rape of Cordelia Holst, a female under the age of ten years, in Jefferson county, Texas, on the twenty-third day of August, 1886. The conviction was for assault with intent to rape, and the penalty assessed was a term of two years in the penitentiary.

Oscar Holst was the first witness for the State. He testified that he was the father of Cordelia Holst, the alleged injured

1 — TEX. APP. XXIII.

female. The witness was now living in the town of Beaumont; but on the twenty-third of August, 1886, he lived on Taylor's Bayou, in Jefferson county, Texas. On that day, the witness's wife sent their daughter Cordelia on an errand to the house of Mrs. Carr, a neighbor. After being gone some time, Cordelia came home crying and hallooing. She was heard before she reached the house, and witness and his wife went out to meet her. Objection at this point was interposed, and the witness was not permitted to repeat the declarations of his daughter. Cordelia came back from Mrs. Carr's about an hour after she left home to go there. She started just after dinner. Mrs. Carr lived about a mile from the witness. Witness and his wife discovered that the private parts of Cordelia were inflamed, and concluded that somebody had been "tinkering" with her. She complained for a day or two, particularly when it became necessary for her to urinate. Witness became convinced that an assault had been made upon his daughter, and he and his wife went to Mrs. Carr's to make an investigation. They found the defendant at Mrs. Carr's. From Mrs. Carr's witness went in search of evidence of the assault upon the girl. He inquired of Stackpole if defendant had been off his place at or about the time Cordelia went to Mrs. Carr's. Witness, his wife and Stackpole then interviewed Cordelia, with the view of getting an idea of locality, etc. They then went to a point on the line of a field fence, where the dirt showed that Cordelia and somebody had crossed into the field. Cordelia was barefooted, and the other was a shod track, and their tracks were easily trailed between two rows to a point where the tall grass was considerably mashed down, and it was concluded that the outrage was perpetrated at that point. The earth showed no disturbance at that point, but the grass was very high. The girl's barefooted track and the shoe track were plain. The field described was Mrs. Carr's field, and was between the witness's house and Mrs. Carr's house. Witness heard his daughter crying before he saw her. She was coming from the direction of the field. He first saw and met her on her return from Mrs. Carr's, a very few minutes after he first heard her crying. She had then been gone about an hour. This occurred on the twenty-third day of August, 1886. Cordelia became seven years old on the twelfth day of the ensuing November.

The witness stated that Cordelia made a statement to him concerning what had happened to her, a very few moments

after he met her and got her comparatively quiet. She said that, on her way home from Mrs. Carr's, she came upon the defendant sitting on the trunk of a fallen tree. Defendant told her that she had better pursue her way home though the field, as he had just seen a bull on the outside, and the bull might do her an injury. She took his advice, and the two crossed into the field and walked along together until they reached a certain peach tree, under which he attempted to rape her, threatening to kill her if she hallooed. Her expression was that the defendant "tried to put his bugger" into her's. She said that defendant would not permit her to halloo, and threatened to kill her if she attempted to do so. Cordelia complained of no physical pain at the time she made the statements repeated by witness, but complained of soreness afterwards, when she had calls to urinate. Her parts were examined by the witness and his wife and found to be very much inflamed. No blood was found about the parts. This examination was made as soon as the girl got home. The place where the outrage was perpetrated was in Mrs. Carr's field, about three hundred yards distant from witness's house. The fence about that field on one side began near witness's house, and thence was a continuous fence to Mrs. Carr's house. Witness saw where his daughter crossed the fence to the road on her return. From the place where the two parties entered the field, witness tracked them together to the place where the outrage was committed.

Cross examined, the witness said that Cordelia was sent to Mrs. Carr's to borrow a pair of saddle bags for witness from his brother Emile, who was staying at Mrs. Carr's. She brought the saddle bags back, with a note in one of the pockets. Witness's wife did not ask Cordelia if the defendant hurt her until after Cordelia told what she was crying about. Witness could not now say whether or not his daughter Elizabeth was at home or at Mrs. Carr's when Cordelia came home. Cordelia was not confined to her bed, but played about as usual. He had seen the defendant's tracks often, and knew the tracks, followed by him from the fence to the place of the outrage, to be the defendant's tracks. Witness knew of no peculiarity about the defendant's tracks, except that they are smaller than the tracks of any one about the neighborhood at the time. Witness followed the tracks to the place of outrage, but did not find them going away. The grass about that place was too high to permit a foot impression on the ground. Witness did not see George Hille-

brandt about the place on the twenty-third day of August. Witness was not on friendly terms with defendant, and had not been for years. He ought, perhaps, to have prosecuted the defendant before now for other wrongs; but had overlooked his past conduct, and even hoped in this case that the jury would inflict only moderate punishment. Witness admitted that he had told defendant's counsel that he did not believe that defendant succeeded in penetrating the person of his daughter.

Re-examined, the witness said that his ill-feeling for the defendant would not induce him to swear to an untruth about him. Witness felt satisfied that the tracks followed by him to the place of the outrage were those of the defendant and his daughter Cordelia. He thought that, had defendant succeeded in penetrating Cordelia's sexual organ with his male member, Cordelia's parts would have shown blood. He did not think the internal part of the girl's organ was penetrated.

Cordelia Holst, the alleged injured female, was the next witness for the State. The opinion states the proceedings upon her examination as to her qualifications as a witness. The substance of her testimony in chief was that, going home from Mrs. Carr's, with a pair of saddle bags on her arm, she came upon the defendant sitting on a fallen chinaberry tree. He told her that there was a bull at large around the corner of the fence. She then got into the field. Defendant went with her as far as the peach tree, when he threw her down and tried to put his "bugger" into her. Witness told her mother and father about it as soon as she got home.

On her cross examination, the witness said that she saw her uncle Emile Holst at Mrs. Carr's, and he gave her a pair of saddle bags and a note to take to her father. She also took a small tin bucket home. Defendant was in the loom house when witness got to Mrs. Carr's. She did not know whether anybody else was in the loom house or not. She did not see Mr. Stackpole. Defendant was gone from Mrs. Carr's when witness started home. Witness did not see him when he left. Witness remained at Mrs. Carr's but a short time, and went home. Witness's mother did not ask her first what defendant did to her. She told her mother and father at once. Witness played with the children after she got home. Defendant told witness not to tell her mother and father what he did to her.

Re-examined, the witness stated that defendant said he would strike her over the head with a club if she told her mother and

father what he had done.  Through a maze of contradictory
statements, in answering questions which it is apparent that the
witness could not understand, it is to be gleaned that the at-
tempt of the defendant to penetrate her person, in which attempt
he failed, occasioned her some pain.  The pain left her when h·
desisted, and did not return until she had calls to urinate.  De-
scribing the nature of the assault, she said that the defendant
threw her down, pulled up her clothes, got on top of her, and
tried to insert his "bugger" into her sexual organ, but failed.

Mrs. Eugenie Holst was the next witness for the State.  The
witness was the mother of Cordelia, testified substantially as
her husband did, stating first that she was in her room when
she first heard Cordelia crying.  She then looked out of her
window and saw Cordelia about two hundred yards off, coming
home from Mrs. Carr's.  When Cordelia got to the house she
asked her what was the matter, and Cordelia told her about de-
fendant's assault upon her.  The witness denied that, at any
time or place, in the presence of her daughter Elizabeth, she
said to Charles Taylor that she only wanted a half chance to
send defendant to the penitentiary.  The State closed.

Elizabeth Holst was the first witness for the defendant.  She
testified that she was the daughter of Mr. and Mrs. Oscar Holst,
lived with them, and was at home on the day of the alleged
assault, when Cordelia came home from Mrs. Carr's.  Witness
could not now remember whether Cordelia was singing or cry-
ing as she came to the house.  She was crying a little shortly
after she got to the house.  Before Cordelia told what was the
matter with her, her mother, Mrs. Eugenie Holst, asked her if
defendant did not hurt her, and she replied, "yes."  She was
soon playing, romping and jumping with the other children,
and did not seem to have anything the matter with her.  On or
about August 1, 1886, the witness heard her mother, at her
home, in the presence of Charles Taylor, say that she wished
she could get a half chance to send the defendant to the peni-
tentiary.  "Mother has not liked him for years.  None of us
children like him, but we would like to see him come clear in
this case."  Neither the witness's father nor mother have been
on good terms with defendant for years.  They have disliked
him very much, and have blamed him for everything that has
gone wrong on the place, and taught their children to do the
same thing.

Charles Taylor testified, for the defense, that he was at Oscar

Holst's house on or about August 1, 1886. While there Mrs. Holst told him, in Elizabeth's presence, that she wanted only a half chance to send defendant to the Huntsville penitentiary.

Emile Holst, the father of the defendant, testified that he was at Mrs. Carr's when Cordelia came there on the day of the alleged outrage, to get his saddle bags for her father. Defendant was then asleep in the loom house. From the time that he handed Cordelia the saddle bags and a note until called to the kitchen to get some coffee, except for a moment when he stepped into the house to get a newspaper, the witness sat on the porch in full view of defendant, and positively knew that the defendant did not leave the loom house. Defendant got up, and witness met him at coffee in the kitchen and saw him at the house continuously, except for a moment when defendant stepped to the back porch for something, until Oscar Holst and his wife came. Stackpole then told him of what the defendant was accused, and witness said then, as now, that defendant had not been off Mrs. Carr's place since Cordelia came and left. Defendant was a little past fifteen years old.

George Hillebrandt testified, for the defense, that some time in August, 1886, he saw Cordelia Holst with a pair of saddle bags, going toward her house from the direction of Mrs. Carr's. She was then within three hundred yards of her home, and was not then crying. She had already passed a certain fallen chinaberry tree that lay on the roadside.

Cross examined, the witness said that he was a cousin of the defendant, but was in no way related to Cordelia, so far as he knew. He lived with Cleophas Broussard in August, 1886, and was on his way to take a horse home when he saw Cordelia, as stated. When he last observed Cordelia she was within one hundred and fifty yards of her father's house. Cordelia was not coming out of the field when witness saw her. She was going home on a road about thirty yards from the field, on the outside. The saddle bags she carried particularly attracted witness's attention. Cordelia was quite a small girl. Witness had not discussed this case with defendant nor with others of his family. Witness could not locate the hour when he saw Cordelia with the saddle bags nearer than that it was one or two o'clock. Cordelia looked at witness but did not speak. The witness could see that she was not crying.

The motion for new trial raised the questions discussed in the opinion.

*H. J. Huck, jr.,* and *H. W. Greer,* for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

Hurt, Judge.   The appellant was convicted in the court below of the offense of assault with intent to rape, and present·· his case here on appeal.

The indictment charges the offense to have been committed upon Cordelia Holst, a female under the age of ten years. Over objection, the State was permitted to make proof in the court below that Cordelia had complained of the assault and exhibited marks of violence.   To this extent it was proper, in an ordinary case, that the testimony should go.   The prosecution was further permitted to put in evidence the particulars of the complaint, and the name of the person whom she had given as the person making the assault.   This also being objected to, its admission in evidence was erroneous.

Upon this subject Mr. Bishop has well said:   "Neither the particulars of the complaint, nor the name of the person whom she mentioned as offender, can, by the English and more common American practice, thus be given.   They may be brought out by the defendant, if he chooses, on cross examination." (Bishop's Crim. Proc., vol. 2, sec. 963.)

In some of the States, however, it is held that the prosecution may call for these particulars, to an extent varying in the different States, in the first instance.   In this State the holding on this question is with the common law rule.   In Pefferling v. The State, 40 Texas, 487, the court says:   "It is, we think, well established, by reason as well as the great weight of authority, that proof of the particulars of the complaint, and the detailed statement of the alleged facts and circumstances connected with it, as was permitted in the court below, can not be admitted as original evidence to prove the truth of the statements testified to by the injured party, or to establish the charge against the prisoner."   And "if the girl is too young, or too little instructed in the nature of an oath, to testify in the usual way, she can not give the evidence otherwise; nor will proof of her declarations be admitted, and so the evidence is lost." (2 Bishop's Crim. Proc., 961.)

We conclude that there was error in admitting as original testimony evidence of the particulars of the girl Cordelia's complaint, and more especially the giving of the offender's name.

The child was in her sixth year at the time of the alleged assault, and had barely attained the age of seven when offered as a witness. When placed upon the stand, as preliminary to her examination, she was tested as to her competency as follows: "I do not know what the gentleman did (presumably referring to the act of administering the oath) when I held up my hand. I do not know how old I am. I have never been to school. I know my A B C's. I do know where I live. I live here in Beaumont now. Last summer I lived down on the bayou. 'When you were on the bayou, did you know how to go around to the neighbor houses by yourself?' Yes, sir; I would walk. I would go by myself and would come back by myself. 'Do you know what would be done with you if you were to tell a story in the court house?' No, sir. 'Have you been talked to about where you would go if you were to tell a story and be a bad girl and then die?' I don't know, sir. 'Do you see anybody else in the court house that you know?' I see Cousin Shep; he is standing by that post out yonder. I do not see anybody else I know. The judge: 'If you were to tell a story while in the court house, it will be very bad, very wrong. If you were to tell a story in the court house, after being sworn, you might be sent to the penitentiary; or if you were to die after telling a story you might go to the bad man.'"

"Examination resumed by counsel: I do know Edward; there he sits (points him out). The Judge: 'Cordelia, that is Mr. Leonard. We will be as good to you as we can be. You shan't be hurt. We are good to little girls here. When Mr. Leonard asks you a question, tell him as near as you can answer the question. Answer just as you remember it, and, if you do not know, just tell him you do not know. This is Mr. Greer here. When he asks you a question, answer that, too.'"

Our law upon this subject provides that, "children, or other persons, who, after being examined by the court, appear not to possess sufficient intelligence to relate transactions with respect to which they are interrogated, or who do not understand the obligation of an oath, are incompetent witnesses." (Code Crim. Proc., art. 730.)

By reference to the examination above quoted from the record, taken in connection with the child's manner of testifying in her after examination, it is doubtful if she came up to the standard of intelligence demanded by the statute, with respect to her ability to relate the transaction. But if this qualification

for competency be admitted, she unquestionably fell short in the other qualifications, viz.: that of being sufficiently advanced in intelligence to "understand the obligation of an oath." This fact was impressed upon the mind of the trial judge, as is evidenced by his effort to instruct the witness upon this subject. The evidence quoted shows that she did not know the fact that she had been sworn at all. Her answer was that she "did not know what the gentleman did when she held up her hand;" nor, it may be added, was she subsequently informed.

Was the instruction given by the court, at the time the witness was placed on the stand, sufficient to bring to her mind a realizing sense of the obligation of an oath? Upon this subject Mr. Russell says: "The effect of the oath upon the conscience of the child should arise from religious (with us, moral) feelings of a permanent nature; and not from instructions confined to the nature of an oath, recently communicated to it for the purposes of a trial." Where the child does not appear to adequately comprehend the nature and obligation of an oath, courts have often thought it necessary for the purposes of justice to continue the case, directing that the child should in the meantime be properly instructed. It is in the discretion of the court to continue for such a purpose. And in a case for want of this qualification, the incapacity arising from no neglect, but from being but six years old and too young to be taught this obligation, Pollock, C. B., refused to postpone the trial, since he "doubted whether the loss in part of memory would not more than countervail the gain in part of religious (moral) education." "Application to postpone in such a case should be made before the child is examined by a grand jury, or, at all events, before the trial is begun; since, if the postponement is after the jury are sworn and the prisoner put upon trial, the judge can not discharge the jury, but should direct an acquittal (if this be all the evidence); and where the child is incompetent to be sworn, the account of the matter which she has given to others is inadmissable." (3 Russ. on Crimes, 612.)

"But, if the witness be an adult, and still does not possess sufficient intelligence to understand the obligation of an oath, it is not proper to postpone the trial in order that the witness may have an opportunity of being instructed upon the subject before the next term, as may be done in the case of a child." (Id., 617.)

As also bearing upon this subject, *vide* Taylor v. The State, decided at last Tyler term, opinion by White, P. J.

Cordelia Holst being incompetent to testify, because not possessing sufficient intelligence to understand the obligation of an oath, the objections of the defendant to the admission of her testimony should have been sustained. For this error of the court below, and for that considered in the opening of this opinion, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

Opinion delivered January 26, 1887.